on our calendar today is Grassi versus Pima County. I'm not sure if I announced this earlier, so I will now. It's 22-15123, and we're ready to hear your argument when you are counsel. Thank you. Good morning. Amy Knight on behalf of plaintiff appellant Terrence Grassi. I would like to try to save three minutes for rebuttal. I'll do my best. Okay. This court should reverse because there are two major problems with the district court's order. One has to do with the agent's treatment of Mr. Grassi in unlawfully ordering him into secondary when they already know that he is a citizen and the stated purpose of their stop is already complete. The second is the one this court asked us to address today, which has to do with the checkpoint itself. The district court determined what it thought the primary purpose of the record contains a large amount of controverting evidence that needs to be resolved by a finder of fact. There are four categories of evidence that this checkpoint has a primary purpose of general law enforcement. One category is their explicit statements, things like their website or their internal reporting, where they focus on narcotics enforcement. The second category, which is a very important one, is a close and formal collaboration with the Drug Enforcement Administration. This is by a formal memorandum that went into effect in 1996 with what was at that time the INS. This was 20 years after Martinez-Fuerte was decided and 10 years before this checkpoint was ever set up. And this memorandum, which is in the record, and we can see it in page 87, specifically contemplates the use of checkpoints for drug enforcement. Third is the way that they operate the checkpoint, what the agents do there, the types of things that they use, the presence of local deputies there. Can I interrupt you? Yes. There's evidence in the record about the purpose of the checkpoint, and I'm trying to figure out if I think that there's an arguably that they were using the as long as one of them is permissible. Well, I think the evidence supports that the primary purpose was general law enforcement. Right. And so I'm not doing a good job, but what I'm asking is if I disagree with you about that, first of all, do you think you have to show that the primary purpose was general law enforcement in order to prevail? I believe that it would be sufficient to show that there are co-equal purposes that were one of them was impermissible. What is your best case that says that that is impermissible? I have not discovered any case where those were the facts, so it hasn't been decided as far as I'm aware. There are cases that say that a clearly undisputedly secondary purpose could be an impermissible purpose. The circuit has said that. So what if we decide that you haven't shown primary purpose, but that there's two purposes, and we could just go with that for a minute. I guess what I'm trying to push back on is if the purpose of the checkpoint is permissible, isn't it possible that the checkpoint could be used in a way that was not according to the policy and be impermissible for that reason? Yes. And I think this gets into, this court has done it as a two-step analysis, for instance, the Frayer case, where the first step is, is the checkpoint per se impermissible because the primary- So let's say we're going to decide it's not per se impermissible. Go on to the next step. Then the second step is, is it reasonable? And if we have a checkpoint that is allowed because there is an immigration purpose going on, then if it is operated in all sorts of ways that are intended ex-narcotics that don't really contribute to detecting unlawful presence of- All the interactions with your client asked about immigration status and people riding in his truck, which is clearly an immigration purpose. So doesn't that kind of make your argument lose some force in terms of how it's actually operated? Those are the questions that they were verbally asking him. They also had a dog that they were running around his truck, for instance, that you can see in many of these videos. Dogs can smell human beings being smuggled as well. That is the position that the Border Patrol takes here. And I don't dispute that dogs can smell human beings, but there are, human beings are allowed to be in the vehicles and they're running them around the vehicles out before they even enter the primary inspection area. It's difficult to understand how they're detecting human smuggling out there when it's not a targeted- But if we think the purpose of the ... We don't have a problem with the ... I'm just saying this in my hypothetical. If I don't have a problem with the purpose of the setup, if I could maybe say it that way, I'm more interested in how it was applied to your client because there was this poster up indicating that he was a US citizen for at least for much of the time. And so it seems to me that going back to your opening statement, you said that they unlawfully ordered him into secondary even after they knew who he was. So I think you would agree that it's not enough for them to know that he's a US citizen, even though they knew he was a US citizen on those occasions. They still have a right to go around and visually check to make sure that he doesn't have anybody else in there with him. Surely you're not going to contest that. They do. Okay. So you submitted quite a number of videos. And what I'm trying to figure out is whether or not you're arguing that video by video, case by case, there were instances where the video shows that they knew who he was, knew he was a US citizen, but unlawfully ordered him into secondary. Is that your position? There are many instances of that in the record. Can you identify which ones where we need to- They're listed out in the briefing. Okay. But I've looked at your briefing and I can't get it to match up. And hence, I wondered if you're really making a case by case, instance by instance kind of presentation where you think they unreasonably applied their rules and asked more of him than they're allowed to do, or whether you were talking about writ large, cumulatively, that your client should be waved through because they know who he is. Something actually, I think in the middle between those two, it's not that he needs to be waved through because they know who he is. It's that once they recognize who it is, and they've had a chance to take a look and they don't suspect anything else at that point, they have no basis to detain him any further. Or to send him to secondary. Right. That's your argument. They have no basis to detain him anywhere in primary or in secondary if they know he's a citizen and they have no reason to think that he is committing any sort of crime or that there is anybody else with him. And that happens repeatedly. Okay. So it's not that clear to me that that happens repeatedly. And that's what I'm most interested in. I think the poster wasn't up during the time that these film clips happened. Is that right? The poster was up for approximately a year. Yes. But does it coincide with the time where these film clips happen? I'm not positive of the exact dates of overlap, but I believe that there was overlap. But regardless of when the poster was hanging, there's evidence in the record that many of these agents knew and recognized Mr. Bresci, as did Deputy Rohr. Right. But I can't get that all of them did. And that's why I'm trying to line up where there's an instance where somebody knows who he is, right? Does the visual check and then still detains him. And you think there are instances like that in the record? There are. There's 18 videos in there. And in some of them, you can see he pulls up and they say, it's Mr. Bresci before they even ask him any questions. So it's clear that they know who he is in some of the videos. At least some of them. Yes. Hang on one second. You're under two minutes. I just want to make sure. Are there other questions? I do have a question or two. I can switch them in. Is it your position that the mere presence of non-immigration law enforcement renders this an enforcement stop? No, it's not. The mere presence of Santa Cruz or Pima County Sheriff deputies being present? It's not their presence. It's what they're doing when they are there. And we have all these reports in the record showing that they are doing general law enforcement there. So it's not reasonable to have local law enforcement present when someone pulls up and the officer looks in the car and there's a bag of cocaine in the passenger seat, which the INS, Border Patrol, whatever, has no authority whatsoever to enforce. It's unreasonable to have local law enforcement present to take care of that? Well, the Border Patrol does have authority to enforce the drug laws. But I think to respond to sort of an emergency or a large situation that arose, that may be reasonable, but that is not what they were doing. They were doing little equipment checks. They were talking about lug nuts. They were writing warrants on people. And it was clearly a general law enforcement function apart from what the Border Patrol was doing. They were asking the Border Patrol, can you pull that guy over for me because I want to talk to you. That's taking advantage of a checkpoint to do their own general law enforcement. The operation of a post-border immigration checkpoint assumes that they have the right to act just as if this was the border, correct? No, that's not correct. At the border, they have much expanded powers. So they have no authority to direct someone into secondary inspection? They have no authority to direct somebody into secondary inspection that they have already determined is lawfully present in the United States without reasonable suspicion. And what about the incident in which Bresci leaned or laid on his horn? In that incident, they knew he was a citizen and they were at that point detaining him without authority. And they were- What was the purpose of leaning on the horn? This isn't, you say, a perfectly innocent person seeking to travel from one point to another. He knows the immigration checkpoint is there. Highway 86 is the only way to get to and from where he's going. What's he doing there? He has stated that he was concerned for his safety. So he was attempting to make sure that people were watching. I think another perfectly reasonable purpose for that is protest, speech. I would like to save a little time for rebuttal, but you're over time. But when I'm done, I'm going to close the council, please. May it please the court, I'm Chris Cabanillas on behalf of the United States for the federal defendants. The goal is- You're dividing time with your colleague. We're going to reserve about two minutes or so, depending on- But you're the principal arguer. I'm sorry? You're the principal proponent for your side. Based on this court's- My thing says that Mr. Peters is going to be given one minute. Yeah, one to two minutes, whatever it is, whatever's left after this court has any questions for me, I guess. Go ahead. Yeah. So the district court properly granted summary judgment because the undisputed material facts viewed in light of the status checkpoint case law demonstrated as a matter of law, there's no Fourth Amendment violation. This court asked a moment ago whether the primary purpose needs to be immigration or if they can override, I think it's undisputed actually, factually, that there's an immigration checkpoint occurring. And the only question is whether or not the plaintiff had demonstrated that the primary purpose had been converted to general crime control. And I'd like to read a quote from Edmund. When law enforcement authorities pursue primarily general crime control purposes at checkpoints, such as here, that's when there's a concern. But we don't have that here. We have uncontradicted testimony on the part of Agent Turan that this was an immigration checkpoint. We're talking about the SR-86 checkpoint, that it operates in conjunction with two other checkpoints in the area with the goal of interdicting illegal immigration. He mentions alien smuggling as well. And that primary purpose that this is an immigration checkpoint is also bolstered by the information from the Border Patrol policy, the training manual. So again, it's an immigration checkpoint. Now, what does the plaintiff have to show on the other side? You asked a moment ago, I think it was Judge Hawkins, about the state. So there's a gap between what's alleged and what's proven. And what the district court did is look at what's proven. What are the facts? So for example, the 444 videos that they produced, they admitted in the response to the interrogators that only 12 of them had a deputy nearby. So that's less than 2%. So I wanted to mention that. And also with the police reports, only 29 instances out of four years, less than 2%. And the great majority of those, as we note in our brief, is for traffic. And as Your Honor correctly noted, it's entirely appropriate for state law enforcement to be called to a checkpoint when they realize that something is occurring that might require their presence. Deputy Rohr happened to be there as the April 10th video shows. And boy, if there is a picture to paint a thousand words, that April 10th video certainly does. When it goes to showing what Judge Graber noted, that the primary inspector was asking immigration-related questions. And then later, the plaintiff ends up blocking the road. And Deputy Rohr is there, as the record shows, just because he's there, for an impounded vehicle to wait for a tow truck. So that kind of gets to what you're talking about, how the presence of law enforcement does not legally demonstrate that this has been changed or converted into a general crime control checkpoint. And the district court's entirely appropriate in deciding that. Okay, so could you go to my question about, let's assume that the setup is just fine, the primary purpose is not, there's no per se problem with the setup. That's my hypothetical. I was trying to ask opposing counsel whether there are instances where you can see in any of these clips where all of the present, everything's present. That is, there's defendants or the individuals knew who he was and had had an opportunity to do the inspection for immigration purposes, but didn't let him go. In fact, required him to go into secondary. Well, Your Honor, I think that the premise that they're operating under, that everybody knows he's a USC the moment he shows up, I think that that's actually not borne out by the record. Okay, so I'm asking a different, I'm asking a really specific question, because I'm not sure it is borne out, that everybody knew him. That's my point. And I know that that poster was up while all those, in fact, I think it wasn't when all those clips were taken. Nevertheless, the allegation, the hypothetical is one that I would be concerned about if they did know him. This is truly a hypothetical. If an officer knew who he was and had a chance to do a check, a visual check to make sure nobody else was in the car with him and whatnot, and then was routinely sending him to secondary, that would be concerning to me, or at least I'd want to know more, because there's this First Amendment issue at stake. Some of the people who approached him recognized that he had a blog. Maybe you think his blog is obnoxious and don't appreciate it. I don't know that. But I'm trying to figure out if there are clips or individual examples where we can see that they did know who he was. And what he's saying to me is he thinks that he was being singled out and they were retaliating for his speech and jerking his chain and causing him to go into secondary when they didn't really legitimately need him to do that. That is my inartful summary. But I want you to respond to that if you would. Sure. And there's a lot of blending in that question between the Fourth Amendment and the First Amendment. And I just wanted to just clarify for Fourth Amendment purposes, they have the right to question someone even in an immigration purpose. And, of course, could you pull the mics closer to you? You bet. Agent Charron testified that not everybody's allowed to pass through simply because they're a U.S. citizen, because they've had instances where USC's commit offenses. Right. In your scenario, as I understand your question, you are assuming they have already resolved whether or not he's a U.S. citizen. That's my hypothetical. And also whether his vehicle is carrying anything unlawful based on a site or a dog check. If they are done with immigration purposes, then any referral to secondary, if it's not for an immigration purpose, their training materials say that it needs to be based on immigration. Right. That's my point. The training materials say if you've got both of those things, you know, as a U.S. citizen, you know, then you let him go. And his allegation, and it is truly an allegation, is that there are instances where he wasn't let go or was in retaliation for his speech. So if you're going to the First Amendment question, it's evident that on April 10th, he cited for what he did, not based on what he said or didn't say. And I want to make that clear because his premise, his entire premise is that every time he comes through that checkpoint, no law enforcement officer can ask him whether or not he's a U.S. citizen. Okay, so forget his premise for a minute, because I'm really trying to get you. I'm not talking about April 10th, and I'm just not doing a good job of asking my question. But are there any instances in any of these clips where we can see that an officer both recognizes him and has had a chance to do an immigration check, but sends him to secondary anyway? You know, I don't have an answer on that because I'm trying to remember all of the videos, and I'm sorry, Your Honor. No, but you don't need an apology. If you knew the answer, I'd want to know it, but that's fine. Okay, no problem. But I just would like to add, though, you know, the Fourth Amendment is really the inquiry here about the checkpoint anyway. And then on the First Amendment side of things, you know, failure to move to secondary at the direction of an agent is not speech, according to this court's case law. And, of course, Agent Teran testified about why it is that somebody who's a USC isn't just automatically, there's no policy requiring them to be waved through. They are entitled to speak to them about immigration purposes, and that's what the agent did, Agent Frye. And I can tell that Your Honor has seen the video. There was a question about dogs. And, of course, this court said in Soylent that it's entirely appropriate to have dogs that smell for both drugs and humans. It's kind of funky to call them cross-certified, but I guess that's what they are. The essence of this is this court would have to overlook an awful lot of its cases in order to find for the plaintiff on the question of the legality of the checkpoint, because it's not just a fact being proposed, like that state deputy fact, you know, the suggestion is that they're sort of crawling all over the checkpoint. The fact of the matter is they prove less than 2% of the time there are state deputies anywhere nearby. And so this court would have to overlook Soto Camacho, even if you were to find that there's a potential for a secondary purpose here that is insufficient legally under Edmund to overcome the legality of this immigration checkpoint. In addition, you'd have to overlook Soto Camacho, where part of the reason they set up that immigration checkpoint was related to drug intel. Bullikhan, Watson, Orozco, Wilson, Soylent, you know, this court would have to overlook an awful lot of cases to find for the plaintiff on this Fourth Amendment question. So I see I have a minute or so left. I'd like to reserve some time for Mr. Summary Judgment Order on behalf of federal defendants, both at the checkpoint decision, the FTCA, and the First Amendment. Thank you. Thank you. We'll hear from your co-counsel. Briefly, if you have any questions that are particular to the Pima County Sheriff, Deputy Rohr, or Pima County's involvement, I'm happy to help answer those questions. Any questions, Judge Weber? No, not for me. Thank you. Okay. I don't have anything more to add then. I do think it's important, though, where this checkpoint is located. You can kind of pick that up in the video of where it is. It's really out in the middle of nowhere. But it's very important as to the roads that intersect on that coming up from Lukeville, coming down, crossing the Dono Odom Reservation. And that's primary purpose has always been immigration. We're there. We get involved at times when asked, when needed. But the primary purpose is immigration. And we're also there to enforce state laws if needed. That's all I have. Thank you. Judge Christine, you asked about videos where they identify Mr. Bresci, and they know who he is, and they continue to detain him. There are eight of them that we listed in our opening brief on page 39. So that would be the place to find those particular videos. The federal defendants have said here that the testimony of Agent Tehran is undisputed, uncontroverted. And that's just not so. He is being a spokesman for the Border Patrol. And they say as their official position that this is an immigration checkpoint. And that's what it's there for and nothing more. There is a lot of evidence in the record that that is not what is actually happening. It is, yes, that is their position. That's what they say the purpose is. But even on their own website, they say it's a checkpoint for immigration and narcotics. They have this arrangement with the DEA where they are there. Explicitly, the agents are allowed to search cars for narcotics. They have an arrangement where if they seize vehicles through forfeiture at the checkpoint, then the Border Patrol gets to share in the use of those vehicles. That's in their agreement with the DEA. And so they're saying, but we're only doing this for immigration purposes. The facts just don't bear that out. This is something that a jury needs to look at. Well, I think their argument is it's the primary purpose. I don't think they say they're only doing it for, right? They say it's the primary purpose. I think that at this point, it's a question of fact. What is the real primary purpose? What are they really doing this for? And there is a lot of evidence that it's not really what they say, right? If they're really doing it because of immigration, they've got all these Border Patrol agents there who are cross-certified to enforce drug laws, right? And they are reporting the success of their checkpoint on their website in terms of pounds of drug seized, not in terms of how many people they arrested. So I think that is a fact question. We have finders of fact in our system and it's not this court and it's not the district court on summary judgment. So I would ask that this court reverse the summary judgment order and send this back to the district court so that a jury can sort this out. Thank you. Thank you for your arguments, all of you. We appreciate it very much along with your very helpful briefing. We'll take this matter under advisement and I think that will stand recess for the day.
judges: HAWKINS, GRABER, CHRISTEN